J. SIDNEY HOOD v. JOHN MITCHELL, Individually; JOHN MITCHELL, Chief State Bank Examiner, Trustee for the Liquidating Agent of the COMMERCIAL BANK AND TRUST COMPANY, GASTONIA, NORTH CAROLINA, its Stockholders and Depositors, and GURNEY P. HOOD, Commissioner of Banks, Trustee, for the Liquidating Agent, Stockholders and Depositors of the COMMERCIAL BANK AND TRUST COMPANY, GASTONIA, NORTH CAROLINA.

(Filed 28 February, 1934.)

1. **Trial D a—On motion of nonsuit all evidence is to be considered in light most favorable to plaintiff.**

On a motion as of nonsuit all the evidence, whether offered by plaintiff or elicited from defendant's witnesses, is to be considered in the light most favorable to plaintiff, and he is entitled to every reasonable intendment thereon and every reasonable inference therefrom. C. S., 567.

2. **Negligence D b—Evidence held sufficient to be submitted to jury in tenant's action to recover for injuries from fall in elevator shaft.**

Evidence that plaintiff had been informed by the manager of a building in which he rented offices as to a safety device on the elevator therein which would prevent the opening of the elevator door if the elevator was not in place at that floor, that plaintiff was given a key to unlock the elevator doors so that he could use the elevator at night when no one was on duty, that plaintiff, at night, unlocked the door of the elevator shaft on the ground floor, and relying on the safety device, and being unable to see whether the elevator cage was in place at the floor because of poor lighting, stepped into the empty shaft to his injury *is held* not to show contributory negligence as a matter of law, and defendant's motion for nonsuit on the grounds of contributory negligence was properly refused.

3. **Judgments L b—Adjudication is not res judicata against those not parties to the action.**

An unappealed from judgment sustaining a demurrer of the chief State bank examiner for failure of the complaint to state a cause of action against him for an injury received by a tenant when the tenant fell down an elevator shaft in a building operated by the bank examiner in

HOOD v. MITCHELL.

the interest of the creditors of the bank will not support a plea of *res judicata* as to the Commissioner of Banks in a subsequent action brought by the same plaintiff against the former defendant and the Commissioner of Banks later succeeding the bank examiner in the liquidation of the bank, the recovery being payable out of assets in the hands of the Commissioner of Banks, the bank examiner being an unnecessary party, and his joinder resulting in no injustice, and the Commissioner of Banks being the real party in interest, and *res judicata* applying only to parties to the action.

APPEAL by defendants from *Oglesby, J.*, and a jury, at March Civil Term, 1933, of GASTON. No error.

This is an action for actionable negligence brought by plaintiff against defendants. The defendants deny negligence and set up the plea of contributory negligence and *res judicata*. "That prior to the institution of this action, to wit: on 9 October, 1931, this plaintiff had about June, 1930, instituted another action in the Superior Court of Gaston County, against the said John Mitchell, chief State bank examiner, and that his complaint set forth as his cause of action the exact statement of facts as set forth in the complaint filed in this cause, and the issues to be decided were exactly the same as in this action, that within the time allowed by law, the defendant, John Mitchell, chief State bank examiner, filed a demurrer on the grounds that the complaint did not state a cause of action, which demurrer was subsequently sustained by the judge of the Superior Court at the August Term, 1930, and judgment was entered thereon, from which judgment the plaintiff did not take an appeal. That thereafter, to wit, on or about the ...... day of ........'......... ......, 1930, the plaintiff took a voluntary nonsuit in said action, and about ...... months thereafter instituted this action against the above named defendants. That as these defendants are informed and believe, this cause of action is against the same parties against whom the former action was instituted with the exception of the defendant, Gurney P. Hood, Commissioner of Banks, who was added as a party by virtue of an act of the General Assembly of 1931, which transferred the duties of the liquidation of banks from the State Corporation Commission and John Mitchell, chief State bank examiner, to Gurney P. Hood, Commissioner of Banks. That by reason of the facts that the plaintiff did not appeal from the judgment sustaining the defendants' demurrer filed in the former cause of action above referred to, these defendants are informed and believe that matters alleged in the plaintiff's complaint in this cause of action have become *res judicata* and judgment in the former action is hereby pleaded in bar of any recovery in this action."

The issues submitted to the jury and their answers thereto, were as follows: "Was the plaintiff injured by the negligence of the defendants,

as alleged in the complaint?" Answer: "Yes." "Did the plaintiff, by his own negligence, contribute to his injury, as alleged in the answer?" Answer: "No." "What damage, if any, is plaintiff entitled to recover of the defendants?" Answer: "$3,000 (three thousand dollars)."

The court below rendered judgment on the verdict. The defendants made exceptions and assignments of error which will be considered in the opinion and appealed to the Supreme Court. The necessary facts will be set forth in the opinion.

*Emery B. Denny, E. R. Warren and A. C. Jones* for plaintiff.
*O. F. Mason, Jr., George B. Mason and P. W. Garland* for defendants.

CLARKSON, J. This action was before this Court before. We find (*Hood v. Mitchell,* 204 N. C., 130), at page 135, the following: "The Corporation Commission of North Carolina, at the date of the injuries suffered by plaintiff, was, and the defendant, Gurney P. Hood, Commissioner of Banks, as the successor of said Commission, is now in possession of the assets of the Commercial Bank and Trust Company of Gastonia, N. C., for purposes of liquidation as provided by statute. The said Commission was, and the said defendant is now, a statutory receiver of the said Commercial Bank and Trust Company, with all the rights and liabilities of a receiver appointed by a court of competent jurisdiction. *Blades v. Hood, Comr.,* 203 N. C., 56; *In re Trust Co.,* 198 N. C., 783. A recovery in this action by the plaintiff will be paid by the defendant, Gurney P. Hood, Commissioner of Banks out of the assets in his hands as statutory receiver of the Commercial Bank and Trust Company, and not otherwise.

It cannot be held as a matter of law that on the facts alleged in the complaint, the plaintiff by his own negligence contributed to his injuries as alleged in the complaint. Ordinarily, where there is evidence tending to support this defense, the evidence must be submitted to the jury. It is rarely the case that the Court can hold as a matter of law, upon the allegations of the complaint, or upon evidence offered by the plaintiff, that plaintiff, who has been injured by the negligence of the defendant, cannot recover damages resulting from such injuries, because by his own negligence he contributed to his injuries. It is sufficient to say that this is not such a case. The decision in *Scott v. Telegraph Company,* 198 N. C., 795, was made on a fact situation altogether different from that in the instant case."

The complaint in the appeal *supra* is fully set forth. The demurrer of defendants in that appeal which was overruled in part is as follows: "(1) That defendants other than John Mitchell, individually, are agencies of the State of North Carolina, and for that reason no action can be maintained by the plaintiff against said defendants to recover damages

for the injuries sustained by the plaintiff, as alleged in the complaint. (2) That the allegations of the complaint show that plaintiff, by his own negligence, contributed to his injuries, and for that reason no cause of action is alleged in the complaint against the defendants."

It will be noted that defendants did not demur on the ground as to the charge in the complaint, of negligence. "That complaint does not state facts sufficient to constitute a cause of action," C. S., 511(6), but demurred on the ground that defendants (1) "Are agencies of the State of North Carolina and for that reason 'the action for damages for injuries could not be sustained.' " (2) "That the allegations of the complaint show that plaintiff by his own negligence contributed to his injuries." May it not be inferred that the learned counsel for defendants, considered that the complainant's allegation of negligence was sufficient to take the case to the jury? This Court sustained the court below in overruling the demurrer. The decision of this Court is *stare decisis*. This Court's decision is sustained elsewhere: Where injury to a tenant occurs the tenant has an action against the receiver and an application by the tenant for leave to sue the receiver will be granted where the negligence occurred through the affirmative act of a servant employed by a receiver of the rents and profits, appointed in an action in foreclosure. *T. G. & T. Co. v. Ukiah Realty Corporation*, 90 L. J., 1925, *Wenzel, J.*

After overruling the demurrer, the defendants answered, denied negligence and pleaded contributory negligence and *res judicata*. The exception and assignments of error on this appeal: (1) At the close of plaintiff's evidence and at the close of all the evidence, the defendants made motions as in case of nonsuit, C. S., 567. The court below overruled these motions and in this we can see no error.

The settled rule in this jurisdiction is that upon a motion as of nonsuit, the evidence, whether offered by the plaintiff or elicited from defendants' witnesses, is to be considered in the light most favorable to the plaintiff, and he is entitled to every reasonable intendment thereon and every reasonable inference to be drawn therefrom.

The evidence of plaintiff was to the effect: That he was 48 years of age, a physician and specialist in eye, ear, nose and throat work. In 1924 he became a tenant, occupied four offices and was located on the 5th floor of the building in controversy, now owned, purchased by Gurney P. Hood, Commissioner of Banks, to protect the stockholders and depositors of the Commercial Bank and Trust Company of Gastonia, N. C., and in responding to an emergency call, he went into the building to go to his offices to get some needed instruments, and was injured 6 April, 1930. He paid his rent until he moved out in 1932. He testified in part:

"There were two Otis elevators which I employed going to and from my offices. The elevators were equipped with a safety device which would not allow the door to be opened from the outside unless the elevator was at that particular door unless you inserted the key or instrument which he furnished me in using the elevator. The building had a lobby through which you passed from the street to the elevator, passing through the front door of the building. I got through the front door with a key which was furnished me by the superintendent of the building, which I had continuously until I moved out of the building in 1932. I got it when I first became a tenant in the building. Purpose of having the key was in case of night work as a physician. I have had to visit my offices to treat patients at night and I would have access to the building and could get in through the front door which was generally locked by the night superintendent when he left and I could not enter the door unless I had a night-latch key. It was furnished by the superintendent.. Mr. Faucette, superintendent of the building, furnished me with a straight piece of iron about the size of a lead pencil that *I would push into the opening of the elevator and trip the latch and the elevator would open if the elevator was there at the landing at the time, but if the elevator was not at the landing at the time, I could not open the door to the elevator, if it was in proper working order.* I have been there many nights and tried to open the door of the elevator after inserting the key but the elevator door would not open. The elevator would be at some other floor. I would go to the other elevator door and find that it would if the elevator was there. During the course of my tenancy there I would use the elevator after the night superintendent had locked up and gone, from two to five nights a week. Some weeks more than that. There was no means of lighting the lobby and the elevator cage at night after the night superintendent was gone, except a light overhead in the lobby, but it could only be turned on with a special key which was inserted in a switch to turn the light on, and I was never provided with a key. The other light was in the elevator cage and you could enter the elevator and step to the right and push a button and light up. The button was on the right side as you entered. The front door of the elevator faces west and has four sides. The button was on the south side and about four feet from the front door of the elevator. To get to it, I would step inside of the elevator, take about two steps and reach the button where the light could be turned on. There was no other light. When the front door key and the elevator key were given to me, I was instructed by the superintendent of the building in the use of the elevator. Keys were given me just after my tenancy in 1924 by Mr. Faucette, the day superintendent; *Mr. White was night superintendent at that time.* Mr. Faucette knew I was using that key at night

HOOD *v.* MITCHELL.

thereafter, as I have stated. *Night superintendent knew that I was using the front door key and the elevator key, as I have stated.* R. B. Wilson is still day superintendent and has been, but during the time he has been there I think Mr. White was day superintendent for a while succeeding Mr. Faucette. *White has been continuously connected with the building as superintendent either day or night since I was tenant there. White had knowledge that I had a key to the front door and a key or instrument to the elevator and knew that I went in there at night after the building had been closed.* White has been there in the building at night when I was in the office at work and before leaving he would bring the elevator up to me and tell me that if I were going to be there longer, he would leave the elevator there for my use and he would go home. When Mr. White was talking to me, the means I had of getting in the elevator was the elevator key. If he stopped the elevator at my floor he propped the door open. *At times I have lost the straight piece of iron or screwdriver and Mr. White would furnish me with another for opening the elevator door at night when no one was on duty to operate the elevator. There was a key or long screwdriver that was generally found on top of the mail box in the lobby, left there for a long time for use of myself and others for the purpose of opening the elevator door. It was placed there by Mr. White.* He told me that people had been using the elevator at night when he was off duty and he said that any time you could come in and don't have your key, I am not going to leave that key on the mail box any more, but you can find it behind the wastebasket, or behind that drumhead. *The State Corporation Commission, through its liquidating agent, purchased the building in which my offices were located about 1929.* I was injured when I went through the elevator shaft on Sunday night, 6 April, 1930, I received a call from Claude Craig to come to his home to take care of an accident to his grandmother. I left home to come to my offices to get some instruments needed to take care of the injury. The front door of the building was not locked yet and I walked in and found the lobby dark, as I generally found it, and I inserted my key to open the elevator door and it opened very readily. Of course I had never known it to do otherwise, and being in a hurry, *I opened the elevator and saw what I presumed was the elevator cage and stepped in, then after feeling the sensation of nothing under me and the precipitation of the fall I remember nothing more until three or four days after, when I regained consciousness and found myself in the City Hospital. I was stepping across to undertake to turn on the light in the elevator cage. Always when I have gone there, I found that if the door would open, the elevator was there.*"

On cross-examination: "If the lights had been on, when I opened the door, I would have seen that there was no elevator there, I could

have seen positively that none was there, as it was I saw shadows that I presumed to be the elevator cage. In answer to your question "If lights had been on when you opened the door you would have looked to see if the elevator was there?' *I would say 'I looked anyway.'* Q. *'Why did you?* A. *'Just for safety sake. I saw some forms or shadows that I presumed to be the elevator, looked like it.'* If the lights had been on I would have looked to see if the elevator was there. I would have done the same thing. The light would have brought the cage out more distinctly. There would have been no mistake about it then. I don't recall ever going in there at night when the lights were on after the operator was off duty.· . . . I could have gone up the stairway and I used the elevator for my individual convenience. The reason I stepped in I looked to see if the elevator was there and I saw some shadows that I thought was the elevator cage and stepped in. . . . *The reason I say the elevator was defective is because the door opened when the elevator was not there, and I knew that the door cannot be opened unless the elevator was there even with the floor on account of the safety device on it."*

Dr. S. E. Moser, a witness, testified in part: "I am a dentist and have my office on the fifth floor of the Commercial Bank Building and have had since 1924. I had a key to the elevator furnished by Mr. Faucette. I have lost about five or six, maybe a dozen. Mr. Wilson furnished me with a key. I frequently went to my offices at night and used this key. After the lights were off, I frequently went to my offices three to a dozen times a week, and then sometimes it would be several weeks before I went at night. *On 4 April, I went to my office after the lights were off and found that the safety device on the elevator door was broken and I told Mr. White and Mr. Wilson. Told Mr. White that night and Mr. Wilson the next morning.* Had a call and went up to get my instruments and I inserted the key in the door and it went back just as it had been doing and I saw that the elevator was not there and liked to have walked in there myself, but I caught hold of the door. *The elevator was not fixed for two or three days after that. Mr. Wilson said he would fix it or have it fixed.* Two days afterwards two mechanics came and fixed the elevator. I fixed Dr. Hood's teeth after the accident. His mouth was badly lacerated and bruised and he had lost four teeth on one side. They were not completely out, but· the crown of the teeth were broken even with the gum line and the roots had to be extracted and he had a fracture of one front tooth. Just a part of. the enamel knocked off. It is not possible to make a mechanical device with which he can satisfactorily chew. Dr. Hood does not have any jaw teeth to meet. Mr. Wilson and Mr. White knew I had a key after February, 1930."

Plaintiff testified: "I had no trouble with my knee and thigh prior to my accident on 6 April, 1930, and my health was good. Since then my health has been impaired by the atrophy and worry."

R. F. Faucette testified in part: "I live at Charlotte and am in the termites business. Have had experience in elevator business. Had charge of Third Trust Building which is a seven-story building and has a basement. Basement floor is ten feet and the elevator shaft is fourteen to sixteen feet from the main floor. Was superintendent of the building from January, 1924, until last of December, 1927. Have had experience with other buildings before that where they had elevators. The elevator at the bank building had two safety devices. One, a travel safety device which caught the elevator in case of a fall, and the other a safety device on the door called an interlock that was on the elevator. If the elevator was functioning properly it could not be opened unless the elevator was even with the floor unless extreme force was used. It would take a crowbar or something like that to open the door, something like a leverage to break the safety lock. At the landing of the elevator on each floor there is one of these safety devices and as the elevator comes to within three inches of the landing that lock works or rather it functions in connection with certain apparatus on the elevator and when the elevator is not at the door the safety lock holds the door in place so that it can't be opened except by force until that elevator is back in place. When the elevator was in place on the main floor it could be opened with a key from the outside. When I was superintendent Dr. Hood had a key to the front lobby door and I gave it to him to gain entrance to the building to his offices at night. I instructed him that he could use the building at night to get to his offices. I gave him the instrument to open the door of the elevator and fully instructed him and showed him how to use it and how to gain entrance to the elevator. I assured him that the elevator would be there if the door was opened and if the elevator was not there then, of course, the door would not open. I went over that with him and inserted the key and showed him how he should work it and saw he worked it properly. I have seen him use the elevator at night. R. B. Wilson succeeded me in December, 1927, as superintendent of the building. He came on the job about a week before I left. I told him who had keys at that time, and what they were for. I told him the purpose of Dr. Hood having a key. I told him that Dr. Hood had been furnished with a key to the front door as well as the elevator door."

Plaintiff's evidence was corroborated by other witnesses. The evidence was plenary to have been submitted to the jury. In *Jacobi et al. v. Builder's Realty Co.* (Cal.), 164 Pacific Reporter (69 Lawyer's Reports Ann., 1917-E, p. 696) 394. The facts were similar as in the present

action. The Court said (page 395) : "It opened to her touch, and assuming, by virtue of this fact, that the cage was there, she stepped forward and met her death. Since knowledge of the defects in construction or in operation, or both, was not only chargeable against this defendant, but was actually possessed by it, it is too plain for discussion that in inviting tenants and their guests to use such a contrivance it was sheer negligence not at the same time to have adequately warned and protected them against dangers necessarily attendant upon the use of the elevator under this defective faulty construction or lack of repair. *Treadwell v. Whittier,* 80 Cal., 574, 22 Pac., 266, 5 L. R. A., 498, 13 Am. St. Rep., 175. Under its second proposition appellant contends that the negligence of the deceased is established by virtue of the fact that if in opening the door she had used her eyesight, as she was in duty bound to do, she would have perceived that the cage was not there, and that it was therefore contributory negligence upon her part to have made the fatal step. We have hereinbefore sufficiently outlined the course of conduct which the deceased doubtless pursued, and also the conditions which prompted her to that course of conduct. It has thus been made to appear, and indeed the positive evidence is to that effect, that people, using such an elevator and finding that in general practice when such an elevator was operating properly a door could not be opened unless the cage was at that floor, had come to rely, in determining the presence or absence of the cage, upon their ability or inability to open the door. The deceased unquestionably opened this door or found it open. In either case (there being no attendant to warn or any other kind of warning given) it was not at least unnatural that she should have placed reliance upon the conditions which she found. Whether under these circumstances she should also have looked or be convicted of negligence, presents a question of reasonable argument before a jury, but one which cannot be resolved against plaintiffs as matter of law: 'An elevator for the carriage of persons is not, like a railroad crossing at a highway, supposed to be a place of danger to be approached with great caution; but, on the contrary, it may be assumed, when the door is thrown open by an attendant, to be a place which may be safely entered without stopping to look, listen, or make a special examination.' *Tousey v. Roberts,* 114 N. Y., 312, 21 N. E., 399, 11 Am. St. Rep., 656."

The case of *Scott v. Telegraph Co.,* 198 N. C., 795, cited by defendants is not applicable; in the former appeal *supra,* it was cited and this Court said "It was made on a fact situation altogether different from that in the instant case," nor are the other cases cited by defendants. All the evidence was to the effect that plaintiff was a tenant not a licensee.

The second contention of defendants "Is the plaintiff barred by judgment in the former action?" We think not.

HICKORY *v.* CATAWBA COUNTY AND SCHOOL DISTRICT *v.* CATAWBA COUNTY.

Under section 218(c), subsection (1), N. C. Anno. Code (1927 Michie), the Corporation Commission is the body authorized to take possession of the banks designated and this was done through an agent of the Commission acting for it—either the chief State bank examiner or other duly authorized agent. Under subsection (6) the remedy for one aggrieved where the Commission had taken possession of the bank was by service of notice on the Commission, not the agent acting for the Commission. Again, under subsection (11) upon rejection of the claim filed with the agent in charge "any action or suit upon such claim so rejected must be brought by the claimant against the Corporation Commission."

It is contended that the agent has only statutory powers, and the capacity to be sued in the instant case is not given. Subsection (7) designated the duties and powers of the agent in collecting and conserving assets. If the plaintiff in the exercise of his right to sue proper party, did so, but has, also, joined an unnecessary party no injustice has been done in the premises as the payment of the judgment is restricted by its very terms to the assets in the hands of Gurney P. Hood, as statutory receiver of the Commercial Bank and Trust Company.

We think the real party in interest was the Corporation Commission, now Gurney P. Hood, Commissioner of Banks. C. S., 446, in part: "Every action must be prosecuted in the name of the real party in interest, except as otherwise provided," *et cetera.*

*In re Trust Co.,* 198 N. C., 783; *Blades v. Hood, Comr.,* 203 N. C., 56. N. C. Practice and Procedure in Civil Cases (McIntosh), at page 186: "That the action must be in the name of the real party in interest, is the pervading feature in The Code system; that is, it must be by the person who is entitled to receive the fruits of the litigation."

We do not think the plea of *res judicata* set up by defendants can be sustained. Adjudication is not *res judicata* against those not parties to action. *Meadows Co. v. Bryan,* 195 N. C., 398. In the judgment, we find

No error.